## ALFRED R. LANDER v. THE STATE.

Where the attorney for the State had asked a witness how the accused was " equipped" as he rode into Jefferson with the witness on the morning of the day of the killing, to which the witness answered that " he had pistols tied to his saddle," and the defence thereupon proposed to prove by the witness that the accused "uttered no hostile expressions about the deceased and spoke of no difficulty with any one," it was held that the offer was properly rejected.

The declaration of an intent to kill a person on sight, hunting such person for that purpose and being armed for that purpose with deadly weapons, and although the parties, owing to their places of residence, cannot reasonably fail soon to encounter each other, and although the jury believe from the evidence, that the threats would have been executed at the first opportunity, will not justify nor excuse the party threatened in lying in wait and killing the party making the threats, nor, it seems, in commencing the attack, without lying in wait, where the rencounter could have reasonably been avoided ; nor will such a state of circumstances reduce a killing by lying in wait, from murder to manslaughter.

More naked threats, unconnected with acts, can never afford a justification or excuse for the commission of unlawful acts, or justify an attack or even an assault.

In a trial for murder, where an attempt is made to prove that the homicide was committed in self defence, the questions are, Was the prisoner in present danger of great bodily harm at the time of the killing ? and was the homicide committed in a *bona fide* effort to preserve himself from the impending danger ?

Every intentional killing is not necessarily murder. For, it may be from a principle of inevitable necessity ; and then it will be self defence : it may be done in the transport of passion and heat of blood upon a sudden and sufficient legal provocation ; and then it will be manslaughter only : or it may be done by the command or permission of the law ; and then it will be justifiable or excusable homicide. But if it be unattended by any of those circumstances of alleviation, excuse or justification which will relieve the party killing from the guilt of mur-

der: if it be murder, within the proper legal meaning of that term, and be proved to be a " premeditated and deliberate killing," within the meaning of those terms as employed in the statute, it will necessarily be murder in the first degree.

Appeal from Cass. Alfred R. Lander was put upon his trial for the murder of Eli Ussery. It appeared in evidence that there had been ill feeling and threats of long standing between the prisoner and the deceased. They lived in the same neighborhood, a few miles from the town of Jefferson; and in going and returning travelled the same road two or three miles. They went to town on the morning of the killing, both armed—the prisoner with holster pistols, and the deceased with a double barrelled shot gun. Same day the deceased was heard to make violent threats against the life of the prisoner, declaring he would kill him on sight; had his gun in his hand all the time, and said he was hunting the prisoner; his manner of looking about attracting the attention of several of the witnesses. The prisoner was advised of these threats, and was cautioned to be on his guard, as the deceased might attempt to carry them into execution. He thereupon went some distance into the country to the residence of one Jackson, where he procured a double barrelled shot gun, and returned to town in company with Jackson. He remained in town for some time, observing the movements of the deceased, but avoiding being seen by him, until in the evening, when the deceased was seen to go to the Postoffice and get the mail bags, preparatory to leaving town. The prisoner thereupon proceeded by a back way or alley to a place where he could intercept the deceased as he should go out of town by the usually travelled road. The deceased had a son, a lad, with him; and after starting delayed to change the mail bags from the horse on which he rode to that on which his son was riding. In the meantime, the prisoner had taken his position in advance, by the wayside, concealed from the view of the deceased by an unoccupied blacksmith shop, and there awaited his approach. The son was in advance of the father, and as the latter was passing, the prisoner hailed him, calling his

name, which arrested his attention, and caused him to bring his horse to a hault, and turn towards the prisoner, who immediately discharged at him one barrel of his gun. The deceased did not fall upon the first fire, but seemed in the act of dismounting, when the prisoner fired a second time, upon which the deceased fell mortally wounded, and immediately expired. Under the charge of the Court, the jury found the prisoner guilty of murder in the second degree, and assessed his punishment at confinement at hard labor in the penitentiary for a term of five years. The prisoner appealed.

There were several questions on the admission of testimony, reserved by bills of exceptions, only one of which was deemed worthy of notice, and that is sufficiently stated in the briefs and opinion. The charge of the Court, so far as the same was peculiar to this case, was as follows:

In case you should find the defendant guilty as charged, the law makes it your duty by your verdict to find whether he is guilty of murder in the first degree or murder in the second degree. Therefore should you conclude from the proof in the cause, that the defendant with malice aforethought, and with a deliberate and specific intent to take life, shot with a gun and killed the deceased, the law declares it to be murder in the first degree, and it will be your duty to so find.

But if you believe that the defendant not being moved by a wicked and malicious intent, but from a just and well grounded apprehension, for the preservation of his own life from a threatened attack from the deceased, inflicted the mortal wound by which death ensued, then he is guilty of murder in the second degree, and not murder in the first degree, and it will be your duty so to find.

But if you find under the proof and law given you, that the defendant took the life of the deceased in what the law calls self-defence, he, then, is guilty of no offence and the law acquits him of all blame and justifies the act. If the deceased threatened the defendant with an attack, the law requires that he should avoid the conflict, if he could do so without endan-

gering his own person; if he could not avoid the difficulty without endangering his own person, and the danger was present and pressing, then such a state of affairs, if proved to your satisfaction, justified the defendant in taking the life of the deceased, and it will be your duty to find him not guilty.

· In relation to the threats of the deceased, against the defendant, given in evidence before you, I feel bound to charge you, that they cannot be considered by you in justification of the offence charged, but may be looked to in connection with the proof in the cause (should any exist) in making up your verdict reducing the offence from murder in the first to murder in the second degree, should such be the tendency of your investigations, under the legal rule which I before laid down in relation to the latter offence. . In no case do threats, unaccompanied with actual or instantaneous meditated violence, justify the taking of human life. There must be an actual danger at the time. In the language of the law, it must plainly appear by the circumstances of the case, as the manner of the assault, the weapons, &c., that one's life was in imminent danger, otherwise the killing of the assailant will not be justifiable self-defence.


*Henderson & Jones*, for appellant. One of the grounds set forth in the motion for a new trial is, that the Court erred in ruling as set forth in bill of exceptions number two. In bill of exceptions number two, it is stated that the District Attorney asked James A. Prewitt, a witness for the State, how the defendant, Lander, was equipped on the morning of the day of the killing, as he rode to town; to which question the witness answered that he had pistols tied to his saddle; and on cross-examination the defendant proposed to prove by the same witness, that, when riding to town, the defendant uttered no hostile expressions about the deceased, and spoke of no difficulty with any one; to which the District Attorney objected, and the Court sustained the objection.

In this the Court certainly erred. The evidence introduced
30

by the State's attorney could have only been intended to prove the hostile intent and disposition of the defendant, and it was certainly lawful for the defendant to do this, by giving in evidence the whole *res gestæ* of the time, occasion, and circumstances, introduced in evidence by the State. Wretched indeed would the condition be, where a man should be prosecuted for his life on the ground of a single circumstance, and he not be allowed to give in evidence the other accompanying circumstances which modify, explain, extenuate, or exculpate it. (*2 Harris v. McHenry, 120; 5 Geo. R. 85.*)

The fifth ground set up in the motion for a new trial is, that the Court erred in its charge to the jury.

The principal error in the charge of the Court is the following, (p. 7.) "But if you believe that the defendant, not "being moved by a malicious intent, but from a just and well "grounded apprehension for his own life, from a threatened "attack by the deceased, inflicted the mortal wound by which "death ensued, then he is guilty of murder in the second de- "gree, and not murder in the first degree, and it will be your "duty so to find." And under this charge the jury did find the defendant guilty of murder in the second degree.

How there can be murder in the absence of malice, it is impossible to conceive. And in this respect it will not be denied that the charge of the Court was wrong, and produced an evil effect on the minds of the jury.

The Court was, also, wrong in saying that he is guilty of murder, who takes life (without a wicked and malicious intent,) under a just and well grounded apprehension for the preservation of his own life from a threatened attack by another.

It is possible that, according to the strict rule of law on excusable homicide, which prevails in England and in some of the United States, this charge might not be considered erroneous. In those countries, order is well preserved, and the laws afford such protection to life, that it is not necessary and therefore not allowed in self-defence to take life, except where there

is an actual assault, by the the party slain. And where there is an actual assault, even the laws of those States allow the assailed to take life in defence of his own; because in that case the law cannot afford him the protection that it affords him in others. The law of nature gives us the right to take life in defence of our own; and the municipal law in no country attempts to restrict this right. Everywhere is it allowed to slay when it becomes necessary to protect our life from the person we kill. This is the universal principle, and prevails everywhere. And the only difference on this subject which prevails in different countries, is a difference, not in this principle, but in the cases which admit of its application, which difference arises from circumstances peculiar to each country. Thus, as was observed, in England and some of the United States, peace and order are well preserved, and the law affords a sufficient protection against all danger to life that does not arise from an actual assault; and therefore, unless in such a case it is not allowable to take life in self-defence, since self-defence does not require it. But very different is the state of things in this State and in some others; and consequently a different practice must and does prevail in all these States. With us there is a large class of persons, (and of whom the evidence shows the defendant must have been one,) who have little or no respect for law, and whom no law can restrain or bind: a class of reckless, lawless, wicked and brutal persons, with whom murder nor any other crime is too heinous to conceive, and who as unhesitatingly execute their wicked conceptions. With these persons, to await the assault, is to await one's death. What they have threatened, they will surely execute, and there is no law that can prevent them. Wherefore the law of self-preservation demands, with us, that a man may take life, "not being moved by a wicked and malicious in-"tent, but from a just and well grounded apprehension for "the preservation of his own life from a threatened attack "from the deceased." And such has all along been the law in this State, and to apply a different rule to past acts, would

be to punish by an *ex post facto* law. The same law prevails in many other States in this Union. (See Grainger v. The State, 5 Yerger, 459; Monroe v. The State, 5 Geo. R. 85; Howell v. The State, Id. 48.)

Nor is there any other law that can teach wicked and malicious persons a respect or regard for the lives of others. As soon as men know that they put themselves out of the protection of the law, by devising and hunting the death of others, they will be taught some regard for human life, but not until then.

And now, whether the facts in the present case showed that the defendant slew the deceased "from a just and well ground-" ed apprehension for the preservation of his own life from a "threatened attack from the deceased," and so was excusable, the jury should have been left free to find from all the evidence. It seems that the Judge thought that such was the case, and the jury may reasonably, and had a right to have come to the same conclusion. And on coming to this conclusion, they should have been instructed to acquit the defendant, and not to find him guilty of murder, under which latter instruction the verdict was rendered.

The remaining part of the charge of the Court on this head, following the part we have commented on, is objectionable in the same light as in the foregoing, and is alike repugnant to the reason and authorities which have been given.

The sixth ground set up in the motion for a new trial was, that the verdict of the jury was contrary to the law and the evidence. If the jury had been left free to find whether the circumstances of the killing were such as to excuse the defendant under the view of the law above taken, and they had found that they were not, possibly it could not be said that there was no evidence to warrant the verdict; but they were not left thus free; they were instructed erroneously on the law, and they were led to find under a misapprehension of both law and evidence.

*Attorney General*, for appellee. The second bill of excep-

tions certainly requires no discussion. That defendant could set up his own language or his own silence, away from the scene of crime, as an excuse or justification of his fatal assault on Ussery, is a flat absurdity.

The fourth point in the assignment, which relates to the charge of the Court, will doubtless be the principal matter of discussion in this cause. It has been the subject of much misapprehension, or rather misrepresentation, and must be admitted to be rather curious in its structure; but I think the Court will agree with me, that the State alone would have had cause to complain of it.

But the counsel for the appellant have insisted in their brief, that Judge Morris ought to have allowed the previous threats, &c., of deceased against the prisoner to have constituted a justification of the act of the prisoner; and this position they say is sustained by the opinions of the Supreme Court of Georgia in the case of Howell v. The State, 5 Geo. R. 49–54, and Monroe v. The State, Id. 85–135, and cases there cited. In commenting upon Monroe's case, it is proper to remark that it is one in which the deceased was approaching the prisoner with a manifest intent to take his life, and fully armed for the purpose, at the time he was shot, and every case cited by the Court is one of this character, i. e. where deceased was approaching the prisoner in what a reasonable man had a right to consider a hostile attitude; and in the case we are considering it was decided that the previous threats and acts of the deceased ought to have been admitted, as in the other cases they were admitted to do justice to the position of the defendants, who were invariably assailed or approached by the persons whom they slew, because proof of the previous threats and acts of the deceased was in these cases necessary to explain the *quo animo* with which the killing was done, for without them the acts of assault, or hostile approach, or manifestly intended violence on the part of the deceased would have been, at most, of a doubtful meaning to defendant, and might have been taken on his trial, not to have been designed

against him, mere harmless movements, approaches of friendship, or ebullitions of fun and frolic.   Judge Lumpkin cites (1st) Meade's case (in Roscoe's Crim. Ev. 645,) which was the case of a defendant slaying one of a mob who had threatened to burn down his house at midnight, and who accordingly, when he shot, were yelling at his door at that hour.   His next citation is People v. Rector, 19 Wend. 567, in which the prisoner's house had been previously broken open by one mob, who threatened to return and do greater violence, and the act charged against him was committed on another mob which he mistook for the same one that had threatened him.   The Court did him the justice to allow him to explain his act by proof of these facts, and rightly.   The next citation is Blake's case (1 and 2 City Hall Recorder, 99,) in which the Court permitted the prosecutor to show repeated quarrels between the prisoner and the deceased to establish the *malo animo* of the prisoner; and this is all this citation decides.

These are all the authorities Judge Lumpkin cites in support of his opinion, on this point, that the previous threats, &c., of the deceased are admissible to explain the *quo animo* of a killing of the threatener by the threatened party, against whom the deceased is demonstrating the intention of immediate violence, that is of instantly carrying out his threats of death or great bodily harm, and where the deceased, so far from lying in wait to slay the prisoner and actually thus slaying him, is calmly pursuing his business.   The judgment of the Court sustained the admissibility of such proof in this kind of cases, and I think it is supported, to this extent by principle and authority; (there is nothing else in Monroe's case at all applicable to this.)   But I regret that the argument of another opinion of the same Court, (Howell v. The State of Georgia, 5 Georgia R. 54 and 55,) referred to by the Court in the case we have been considering, is not equally entitled to our respect.   In that case Judge Warner, after quoting certain Common Law principles, somewhat modified and embodied in the penal code of that State, that it "is

"justifiable homicide to kill a human being in self-defence or
"in defence of habitation, property or person against one who
"manifestly intends or endeavors, by violence or surprise, to
"commit a felony on either, but a bare fear of any of these
"offences, to prevent which the homicide is alleged to have
"been committed, shall not be sufficient to justify the killing.
"It must appear that the circumstances were sufficient to ex-
"cite the fears of a reasonable man, and that the party killing
"acted under the influence of those fears, and not in a spirit
"of revenge," proceeds to put a construction on some of this
quoted language (which is almost entirely in the words of the
best Common Law writers,) to which it is not in my power to
give my assent. This was again a question of the admissibil-
ity of threats of which the Judge says, "The threats of Dill
"(the party injured) proposed to be proved by the witness,
"manifested an intent, on his part to commit a felony on the
"person of the defendant. Whether the evidence was suffi-
"cient to excite the fears of a reasonable man, or only a bare
"fear that an attack would be made on the defendant's per-
"son by Dill was a question for the jury."

The Judge has totally mistaken the meaning and construc-
tion of this language in several respects, first, in the force of
the term "manifestly," which I derive from "*manus,*" "the
hand," and "*facere,*" "to do," which must mean, in this
passage at least, to denote some physical or manual demon-
stration. (Webster's Dictionary sustains this definition, and
so does general usage.) Secondly, In separating "manifestly
intends" from their associates in this passage, to wit: "or
endeavors by violence or surprise." This is not the first or
the last time that this perversion of this passage has, of later
years, sent away the murderer and the assassin, free and tri-
umphant from a trial that ought to have conducted him to the
scaffold. Bare threats cannot manifest an intent in the sense
of this passage. This error of Judge Warner inevitably led
to another equally transparent, that is, to a grievous mistake
of what is meant by the term "bare fears." Now, if I am

right in concluding that " manifestly intends or endeavors," in the passage we have been considering, cannot have place or be predicated of any affair unattended by some manual or physical demonstration, then we make sense of the term "bare fear," for they would mean fear, naked and stripped of this necessary attendant of a manual or physical character; but the Judge makes strange work of the language in his way of construing the passage. He supposes that " bare" and " reasonable" are here used in contradistinction to each other, than which scarcely any greater violence could well be done to language. " Reasonable" here evidently means well founded, based on good reasons, while " bare" means " stripped of something," " separated from something to which it had been or might be attached." These terms can have no relation to each other. The conclusion of the learned Judge, therefore that naked threats of a character to excite the fears of a reasonable man would be effective in the defence, while those which could only produce a " bare fear," he admits, would be of no weight, is founded on the wrong premises, is incongruous, lame and impotent. While I dispute the correctness of this doctrine of Judge Warner, I admit that this case, too, was correctly decided, as it only resulted in the conclusion that previous threats by the party injured, against the life of the defendant, were admissible in evidence, leaving their weight with the jury to the only true test, that, if the injured party " manifested" an intention, at the time and place of the act, of doing immediate violence to the defendant, and was in a situation to accomplish it, they might serve to justify the accused for anticipating the impending assault; but it follows as a necessary corollary from this proposition, that they could serve no purpose of extenuation or excuse for a party who made the first and only assault, with none impending over him, having duly and deliberately prepared the means for it, and who cunningly sought the occasion, and found it by lying in wait for his unsuspecting victim:

In any view, then, which can fairly be taken of these

Georgia cases, they can have no influence upon the decision of this cause at all favorable to the appellant. It may be remarked in this connection, that even Grainger's case, with all its anomalous character, cannot avail the defendant anything as even in that the deceased and his party pursued the defendant several miles, and appeared to menace him by their acts with actual and immediate violence, and the only peculiarity of the case is that the adverse party was acting in jest, as they in-insisted, and the Supreme Court gave Grainger the benefit of the actual fear in which their acts placed him.

WHEELER, J. To reverse the judgment of conviction it is urged that the Court erroneously excluded evidence proposed by the accused; and also that there is error in the charge of the Court.

The attorney for the State had asked a witness how the accused was "equipped" as he rode into Jefferson with the witness on the morning of the day of the killing. To which the witness answered that "he had pistols tied to his saddle," and the defence thereupon proposed to prove by the witness that the accused "uttered no hostile expressions about the deceased and spoke of no difficulty with any one;" which, upon objection, the Court excluded; and this is assigned as error.

The attorney for the State had not questioned the witness as to any statements or conversations of the accused at the time. And yet it is insisted that the accused had the right to prove that he did not use threatening language, or give expression to any hostile intentions toward the deceased. The proposition was to prove what the accused did not say, when there had been no question asked as to what he did say. It is scarcely necessary to say that a party could not thus make evidence for himself; that the testimony proposed was irrelevant; did not conduce to prove any fact pertinent to the issue, was no part of the *res gestæ*; nor of a conversation drawn out by the examination on the part of the State; and was very clearly inadmissible.

Other similar questions upon the admissibility of evidence were reserved; but they are not deemed of a character to re-quire more particular notice. And, indeed, the only matter presented by the record which does require notice, is the part of the charge of the Court, in which the Court treated of the effect of the previous threats of the deceased. On that sub-ject, the Court charged that, "if the defendant, not being "moved by a wicked and malicious intent, but from a just "and well grounded apprehension, for the preservation of his "own life from a threatened attack from the deceased, in-"flicted the mortal wound by which death ensued, then he is "guilty of murder in the second degree and not murder in "the first degree."

By a "threatened attack" it is evident the Court meant the previous threats of the deceased. The Judge could have meant; and the jury could have understood him to mean nothing else; for there was no pretence of attack or threatened attack by deceased at the time of the killing. Divested of the peculiar phraseology which obscures its meaning—that is, the expressions "not being moved by a wicked and malicious intent," "well grounded apprehension," and "threatened at-tack;" and viewed in reference to the fact of the case—the legal proposition which the charge announces is, that pre-vious threats, of themselves, and unconnected with any mani-festation at the time of the killing of an intention to carry them into immediate execution, will extenuate the crime and penalty of a willful, premeditated and deliberate homicide, committed in cold blood, by one laying in wait purposely to take the life of his adversary; if the motive which actuated the slayer was the preservation of his own life from future, and of course, contingent danger, apprehended by violence from the deceased. Or, in other words, that bare, naked threats unconnected with acts, may extenuate and reduce the crime of murder, committed by a "premeditated and delib-erate killing," which the statute defines to be murder in the first degree, to murder in the second degree.

The annunciation of such a proposition from the bench is calculated to arrest attention. And it is natural to inquire upon what principle it is that this effect is ascribed to previous threats. It cannot be on the ground that they constitute what the law deems a sufficient provocation to extenuate the guilt of homicide. For that can never be where the killing is deliberate, or of cool purpose. The extenuation admitted in cases of provocation is the indulgence which the law extends to the first transport of passion, in condecension to human infirmity; to the *furor brevis*, which while the frenzy lasts renders a man deaf to the voice of reason. And "it is the " nature of the provocation, and not the mere effect of it on " the mind of the prisoner which the law regards." (2 Stark. Ev. 722.) Therefore, " no affront by bare words or gestures, " however false or malicious, and exaggerated with the most " provoking circumstances, will free the party killing from " the guilt of murder." (1 Russell on Cr. 514.) And the plea of provocation will in no case avail, where there is evidence of express malice (Id. 520) and it does not appear that the party killing acted upon such provocation. For "in all " cases of provocation in order to extenuate the offence, it " must appear that the party killing acted upon such provo- " cation, and not upon an old grudge." (Whart. Am. Cr. L. 242.) " The provocation which is allowed to extenuate in the " case of homicide must be something which a man is con- " scious of, which he feels and resents at the instant the fact " which he would extenuate is committed." (1 Russell on Cr. 513–14; Fost. 315.)

It could not have been intended to invoke any principle of the law upon the subject of provocation, as having any, the remotest application to the case before the Court; or to rest the doctrine asserted as to the effect of previous threats upon this ground. For if there had been what the law regards as provocation sufficient to extenuate the crime, it could not have been murder of either degree; but would be manslaughter only.

There is, if it were possible, even less, certainly not more reason in the law, for holding mere naked threats, unconnected with acts, to amount to the justification or excuse of homicide on the plea of self-defence. This defence proceeds on the ground of the justification or excuse, not the mere extenuation of homicide. It does not extenuate, or reduce from one degree of crime to another, but it wholly acquits of crime. Threats communicated may excite fear; but they cannot occasion danger. They may enable a party to guard against the threatened mischief, and thus avoid the danger. But they can never afford a justification or excuse for the commission of unlawful acts; or, of themselves, justify an attack, or even an assault; much less a killing by laying in wait with a deadly weapon.

The right of self-defence rests upon the law of necessity. It is the natural and inalienable right of every human being; and it is to be held sacred and inviolable by any law of human or civil institution. It does not depend upon any law of society. It is derived from a higher source; is coevil with man's natural being; and hence it is with truth and reason said, that self-preservation is the first law of nature. " Self-" defence, therefore, (says Blackstone) as it is justly called the " primary law of nature, so it is not, neither can it be in fact, "taken away by the law of society." (3 Bl. 4.) It may be rightfully exercised by every human being, whether beneath a despot's rule, or on freedom's soil; whether he exists in a heathen land, or breathes beneath a Christian sun. But still, it is a law of necessity; and while, in its just and proper exercise it places the subject of it above and beyond the influence of the civil or municipal law; renders him irresponsible for his acts done by its permission, and not amenable to the civil authority; yet it has its limit, as well defined as is the limit of any right which a man may exercise in subordination to the laws of society; and that limit is where the necessity which gave the right ceases. The necessity and the right are from their nature co-extensive and concurrent. Where the

necessity arises the right instantly accrues; and when the necessity ceases the right no longer exists.   There is no difficulty in comprehending what is to be understood by the right of self-defence; and if none were disposed to transgress its bounds, there would have been no necessity for the enacting of laws for the prevention of wicked, malevolent and vindictive violence; or the wanton exercise of a cruel, revengeful and malignant spirit.   But experience has shown that laws are necessary to ascertain and prescribe the true limit of the rightful exercise of this right of self-defence; and to restrain and punish the transgressor.   The rules and principles which the law has recognized, and which it enforces, do not undertake to restrain a man's natural right; but they afford it their necessary shild and protection, by the restraints which they impose on those who would abuse its exercise, and under the cover and pretence of self-defence, seek occasion for the indulgence of a spirit of malevolence, cruelty and revenge.   Those rules and principles have their foundation in the law of nature; they are incorporated into and form a component part of the Common Law; are sanctioned by the wisdom and approved by the experience of ages; they form the best exponent of the nature of right; and in an undeviating adherence to them, is to be found the best, and only sure guaranty for the protection and preservation of the natural and inalienable right of self-defence, which human wisdom has conceived, or can devise.   And whenever they shall be relaxed or departed from, it will impair the estimate of the sancity of human life, induce a loose estimate of its value, and tend to a state of society in which licentious, wanton violence may go unrestrained, brute force usurp the prerogative of the law, and every man become the avenger of his own wrongs; when no right of person or property may be esteemed sacred and inviolable, or will be enjoyed in security.

It is the necessary consequence of the right of self-defence, and therefore it is the universally received principle and maxim of the law, that " a man may repel force by force in the

" defence of his person, habitation, or property, against one
" or many who manifestly intend and endeavor, by violence
" or surprise, to commit a known felony on either.   In such a
" case he is not obliged to retreat, but may pursue his adver-
" sary till he find himself out of danger; and if, in a conflict
" between them, he happeneth to kill, such a killing will be
"justifiable." (Whart. Am. Cr. L. 254.)   "But a bare fear
" of any of these offences," (murder, robbery, and the like,)
" however well grounded; as that another lies in wait to take
" away the party's life, unaccompanied with any overt act,
" indicative of such an intention; will not warrant him in kil-
" ling that other by way of prevention : there must be an ac-
" tual danger at the time." (1 East's Crown Law, 272.)   "To
"justify a homicide on the ground of self-defence, it must
" clearly appear that it was a necessary act, in order to avoid
" death or some severe calamity." (2 Stark. Ev. 721; 1 Coxe
424.)   Or from the nature of the attack which he is forced to
repel, the party killing must have had reasonable ground of
belief that there was a design to destroy his life or do him
some great bodily harm. (Whart. Cr. L., 258, 259–60.) And
" in all cases of homicide excusable by self-defence, it must be
" taken that the attack was made upon a sudden occasion,
" and not premeditated or with malice." (1 Russ. 661.)  " A
" force which the defendant has the right to resist, must itself
" be within striking distance.   It must be menacing, and ap-
" parently able to inflict physical injury, unless prevented by
" the resistance he opposes." (People v. McLeod, 1 Hill,
420 ; Whart. 260.)   " The belief that a person designs to kill
" me," it was said in a late case in North Carolina, " will not
" prevent my killing him from being murder, unless he is
" making some attempt to execute his design, or, at least is
" in an apparent situation to do so, and thereby induces me
" reasonably to think that he intends to do it immediately."
(Ib. 4 Iredell, 409.)   " The right of resorting to force upon
" the principle of self-defence, does not arise while the appre-
" hended mischief exists in machination only." (Whart. 260.)

" No contingent necessity will avail; and when the pretended " necessity consists of the as yet unexpected machinations of " another, the defendant is not allowed to justify himself by " reason of their existence." (Id. 255; 1. Hill (N. Y.) R. 377; 3 Iredell, 186.)

There is and can be no pretence that the facts of the present case bring it within any of these rules, which ascertain and mark the limit of the lawful exercise of the right of self-defence. There is no dispute about the facts. The accused was not the party attacked. He was the assailant; not the deceased. There is no pretence of an attack or threatened attack from the latter, present and impending over the accused at the time of the commission of the homicide. The accused was the sole aggressor, on that occasion. There was at the time no danger, and could have been no apprehension of present danger from the deceased; and of course, there was and could be no present necessity, or well grounded belief of the existence of a present necessity of taking his life by the accused for the preservation of his own life. The accused did not act on the defensive. Instead of endeavoring to avoid the necessity, he sought the occasion. Being apprised of the threats of the deceased, he went about compassing his destruction. He prepared for the occasion; unobserved watched, or was apprised of the movements of the deceased—was under no necessity of encountering and did not encounter him in open combat, or on equal terms, if even that, where the occasion was sought by him, would have been a defence—but watched his opportunity, and when it was evident the deceased, if he had sought a rencounter, had given it over, at least for the time, he pursued, and unobserved by the deceased, took his position by the way side, where still unobserved, he waited his approach, and as the deceased was passing shot him from under cover without giving him timely notice to stand in defence of his life, or to make good his retreat; and only sufficient to embitter the last moment of his life by the consciousness that he died by the hand of his enemy. We abstain from comment. It is unnecessary.

It is very evident that to denominate this a killing in self-defence would be an abuse of terms. There manifestly was no immediate danger or present necessity, to bring it within the principle which excuses a homicide committed for self-preservation—no provocation, which the law will recognize, to extenuate or reduce the degree of the crime—there was indeed nothing attending, or giving character to the act which the law regards as matter in justification, excuse, or extenuation. There can be but one opinion as to the true character and degree of the crime.

Nor could the Court have intended to rest the doctrine maintained, as to the effect of previous threats, on the ground that they supported this defence. For then they would have had the effect, not merely to extenuate from the first to the second degree of murder ; but they would have constituted a complete justification or excuse of the homicide; and of course it could not have been murder of any degree, or manslaughter ; but would be justifiable or excusable homicide.

The error of the Court evidently arose from confounding previous threats with a " threatened attack," or menacing, present danger ; or, as the terms import, the manifestation by acts of a present intention of immediate attacking ; and also from confounding malice in a legal sense, with malice in its popular signification ; in which it is used to denote an evil or malevolent motive and disposition of the mind ; and from not bearing in mind that every intentional killing of any human being, by a voluntary free agent of sound memory and discretion, unless justified by command of the law; excused by its permission, as in the case of self-defence ; or extenuated by some sufficient legal provocation or by being the involuntary consequence of some act not strictly lawful ; is, in a legal sense, malicious ; and no inquiry can be instituted into the actual motive and disposition of mind which prompted the act, except by proof of the facts which make out the justification, legal excuse, or extenuation. For all homicide is presumed to be malicious, and of course amounting to murder,

until the contrary appears, from circumstances of alleviation, excuse or justification; and those circumstances which go to alleviate, excuse or justify, it is incumbent on the accused to make out in evidence, unless they arise out of the evidence produced against him. When the law makes use of the term malice aforethought as descriptive of the crime of murder, it is not to be understood merely in the sense of a principle of malevolence to particulars, but as meaning that the fact has been attended with such circumstances as are the ordinary symptoms of a wicked and malignant spirit. (1 Russ. on Cr., 482.) Malice "in its legal sense, denotes a wrongful act done intentionally without just cause or excuse." (1 Id. 483. n. i. 5th Am. from 3rd London Edit.) "The legal import of the term " (it has been said) differs from its acceptation in common con- " versation. It is not, as in ordinary speech, only an expression " of hatred and ill will to an individual, but means any wicked " or mischievous intention of the mind. Thus in the crime of " murder, which is always stated in the indictment to be com- " mitted with malice aforethought, it is neither necessary in " support of such indictment to show that the prisoner had any " enmity to the deceased, nor would proof of absence of ill will " furnish the accused with any defence when it is proved that " the act of killing was intentional, and done without any jus- " tifiable cause." (Per Best. J. 2 B. & C. 268; 1 Russ. 483 n. i.) " Malice in law is a mere inference of law, which re- sults simply from a wilful transgression of the law." (2 Stark. Ev. 674.) It imports simply the perverse disposition of one who does an act which is unlawful, without a sufficient legal excuse therefor; " and the precise and particular intention " with which he did the act; whether he was moved ' *ira vel* " *odio vel causa lucri*,' is immaterial; he acts maliciously in " wilfully transgressing the law." (Ib.)

If the idea, which the charge of the Court evidently conveys, that the real motive and disposition of mind which prompted the commission of the deed gives character to the crime and determines its degree, were the law, then there could be no

31

homicide which might not be reduced to murder in the second degree, or even to excusable or justifiable homicide, no matter in what particular manner the homicide may have been committed. For if the motive is to govern in determining the degree of crime, then, of course, in that view, it can make no difference in what manner the killing was effected; whether by laying in wait, " by poison, starving or torture," (instances given in the statute of murder in the first degree,) or by " other premiditated and deliberate killing," or whether " committed in the perpetration or attempt," to perpetrate any of the crimes mentioned in the statute, (Dig. Art. 501,) still the inquiry might be by what real motive and disposition of mind the party killing was actuated, and if the jury should be of opinion that it really was not " from a wicked and malicious " intent, but from a just and well grounded apprehension for " the preservation of his own life" from future danger it would only be murder in the second degree; and with equal reason it might be held to be neither murder nor manslaughter, but justifiable homicide. For if the motive is to control, then, of course, it follows that we must search for and be governed by the true motive; and if we are at liberty to suppose that a wilful, premeditated and deliberate killing may be from any motive which the law does not deem " wicked and malicious," as the charge supposes, then we may with equal reason be at liberty to suppose that the real motive which prompted the act was not in the least reprehensible; and hence conclude that the agent does not merit the punishment even of murder in the second degree, or, indeed, any punishment whatever. It may be supposed that those native tribes, who, we are told, put an end to the lives of their aged and infirm, in order to relieve them from their suffering, are not really prompted by a wicked and malicious intent, in the common acceptation of the terms. Yet no one will suppose that our law would tolerate such a plea; or suffer such a motive to be urged in extenuation of the crime. Of course it is not to be supposed that the Court ever thought of carrying the doctrine to any

such extravagant length as this.   The contrary is shown by the limiting of the extenuation, deduced from the real motive and disposition of mind of the accused, to murder in the second degree.   But the illustrations are employed for the purpose of showing to what consequences it might lead, if the inquiry were once admitted into the real motive which prompted the act, as a ground of extenuation or excuse for the crime.   It would confound all legal ideas and rules in relation to the degrees of homicide.   As observed by Mr. Starkie, " Whenever " the law defines a right or prescribes the performance of a " duty, or prohibits a particular act, the wilful violation of " the right, omission of the duty, or transgression, without le- " gal excuse, is necessarily illegal, without regard to intention ; " it would be manifestly mischievous, and even inconsistent " with the very notion of law, as a general rule of conduct, to " allow the crude opinions of individuals to supercede the force " of law." (2 Stark. Ev. 673 Tit. " MALICE.")   " When a de- " fendant is proved to have done that, the malicious doing of " which is prohibited by law, malice is a *prima facie* infer- " ence from the very act, for he must be presumed to have in- " tended to do that which he did, and an intentional violation " of the law is a malicious violation of it."   (Ib.)   Every intentional killing without lawful justification, excuse, or extenuation, is a malicious killing, amounting, of course, to murder ; and " all murder committed by poison, starving, torture, or other premeditated and deliberate killing," " is murder in the first degree." (Dig. Art. 501.)   Murder thus committed can be of no less degree.   In such killing the law necessarily implies malice, from the fact of killing without lawful excuse, whatever may have been the real motive prompting to the commission of the deed.

Every intentional killing is not necessarily murder.   For it may be from a principle of inevitable necessity, and then it would be self-defence : it may be done in the transport of passion and heat of blood upon a sudden and sufficient legal provocation ; and then it will be manslaughter only : or it may

be done by the command or permission of the law, and then it will be justifiable or excusable homicide. But if it be unattended by any of those circumstances of alleviation, excuse or justification which will relieve the party killing from the guilt of murder: if it be murder, within the proper legal meaning of that term; and be a "premeditated and deliberate killing," within the meaning of those terms, as employed in the statute, it will necessarily be murder in the first degree.

There can be no doubt, therefore, that the Court did err in the charge we have considered. But there is as little doubt that it was an error in favor of the appellant; one which operated in his favor; and which, under the evidence in the case, could not possibly have operated to his prejudice. And upon no principle can it be maintained that for such an error this Court would be warranted in reversing the judgment.

The cases cited by counsel for appellant (decided in Georgia and Tennessee) have not been adverted to, for the reason that they were not deemed applicable to the questions arising in this case. In Howell v. The State, (5 Geo. R. 48,) which was an indictment for an assault with intent to murder, the question was as to the admissibility in evidence of the threats of the party assaulted; and they were held admissible in evidence. In the present case they were admitted without objection; and of course there was and could be no question to be determined upon this appeal, as to their admissibility. In Monroe v. The State, (Ib. 85,) which was an indictment for murder, the same point was raised and it was held that " Threats accompanied with occasional acts of personal vio-" lence, are admissible to justify the reasonableness of the de-"fendant's fears, provided a knowledge of the threats is brought " home to him." But there is no opinion advanced in the case which ascribes to mere threats unaccompanied with acts any such effect as is claimed for them in the present case. The other is the case of Grainger v. The State, (5 Yerger, 459,) which has been the subject of much comment, and doubtless, some misapprehension as to what it was intended to decide;

and its authority is, at least, questionable. (Whart. Am. C. L. 260.) The language of the Court seems not to have been sufficiently guarded. Nor does there appear to be any precedent or authority in the law for the general principle announced by the case. But the opinion does not treat of the question presented in the present case, and there is therefore no occasion to examine the doctrines it asserts. But it may be remarked that to do justice to the judgment of the Court in that case, it is necessary to look not alone to the language of the opinion, but to the facts of the case present to the mind of the Court: and to bear in mind that the question was, not whether the accused was justifiable or excusable, (for it is evident the Court did not intend to intimate that he was not guilty of manslaughter,) but simply whether the homicide was, under the circumstances, " of malice prepense so as to exclude the benefit of clergy." There is no analogy or resemblance in the facts of either this, or the other cases cited, to the present. Neither is an authority upon any question arising for determination upon the record in this case ; and a more particular reference, or examination here of the doctrines they advance, therefore, would be out of place.

The present is deemed a fit occasion to remark that it is matter of surprise, that the Legislature should have thought proper to limit the security which may be had in a recognizance to bind over to keep the peace, before a Justice, to the sum of two thousand dollars ; to fix such a limit to the security which a man may demand, (without resorting to a higher tribunal, often impracticable,) against a threatened injury to his person or property. (Dig. Art. 1701.) It could scarcely have been intended to deny a man, whose personal safety is endangered by the wanton violence of another, the right to demand that that other should be restrained of his liberty and the ability to endanger his life and the peace of society, until he will give security in such a sum as will be amply sufficient to ensure that protection, which it is the duty of government and the intention of the law to afford. The law should extend

to every man's rights its ample shield and protection. No man, and especially, no man who desires to respect the law and the rights of others, should be denied the utmost protection which the law can afford against any threatened invasion of his own rights; or should, by reason of the want of such protection, be driven to the necessity " to do himself that im- " mediate justice to which (in the language of Blackstone) he " is prompted by nature, and which no prudential motives are " strong enough to restrain." When violence is threatened, and a man may be compelled to repel force by force, because " it is impossible to say to what wanton lengths of rapine " and cruelty outrages of this sort might be carried 'unless it " were permitted a man immediately to oppose one violence " with another," and the future process of the law can, for such injuries, afford no adequate redress; the strong arm of the law should be interposed for prevention; and there should be no limit to the security which may be demanded short of that which will be amply and certainly sufficient to insure its object. And if such security were promptly afforded in every proper case, it might indeed be said, " Instead of attacking " one another for injuries past or impending, men need only " have recourse to the proper tribunals of justice." (4 Bl. 184.) And the principal pretext, which men now have for avenging their own real or imaginary wrongs would be taken away.

It is supposed that the object of fixing a limit to the amount of security in recognizance, which a Justice of the Peace may require, was to guard against an arbitrary abuse of power in those inferior magistrates. But when it is considered how very little danger is really to be apprehended from that source, compared with the danger that they will not act sufficiently energetically; and that in case of abuse, the writ of *habeas corpus* will afford ready relief, it will be apparent that the danger of an excessive exercise of power is rather imaginary than real. It is to be hoped that this feature, which now mars the code, will be effaced from its pages.

There is in the record no erroneous ruling adversely to the

appellant.   The evidence warranted a conviction upon the charge preferred in the indictment; and the judgment must be affirmed.

Judgment affirmed.