

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-11-00543-CR

MONTREY LAMAR WAGGONER                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

## FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Montrey Lamar Waggoner of aggravated assault with a deadly weapon and assessed his punishment at fifteen years' confinement and a $10,000 fine. The trial court sentenced him accordingly. In two points, Appellant complains about (1) the exclusion of evidence showing his state of mind at the time of the incident and that the complainant was the

---

[1]See Tex. R. App. P. 47.4.

aggressor and (2) the trial court's refusal to include a charge on necessity for uncharged conduct in the jury charge. Because we hold that the trial court did not reversibly err, we affirm the trial court's judgment.

**Background Facts**

On January 12, 2010, Appellant was at home playing videogames with friends. Matthew Taylor, an acquaintance also known as M.T., arrived unexpectedly. Appellant admitted to speaking with Taylor earlier that day when both were in vehicles stopped in traffic but testified that he and Taylor were not friendly enough for Taylor to drop by without an invitation, which Appellant did not extend. Appellant testified that Taylor had acted strangely after entering the home, and then Appellant caught Taylor trying to steal videogames and money. They exchanged words, and Appellant told Taylor to leave. But the situation escalated, Taylor talked about fighting, and Appellant retrieved a gun. Friends talked Taylor down, and he was persuaded to leave.

Thirty minutes later, Taylor returned. Appellant testified that Taylor was yelling and banging on the door to the house, stating that he wanted to fight. Appellant's friend, Bryan Smith, calmed Taylor down and convinced him to leave.

Later in the day, Taylor returned a third time and again banged on the front door. Appellant testified that he was concerned because his children were in the home. Smith testified that he thought Taylor was going to kick in the door. Appellant's neighbor, Taylor Tidwell, testified that he heard what sounded like someone punching the door.

2

The banging stopped, and Appellant went outside with his gun drawn. Taylor was now ten to twelve feet from the front door of the home, according to Appellant and Smith. Appellant testified that he pointed the gun at Taylor and told him not to take another step forward, but Taylor continued to approach. Appellant stated that Taylor's right hand was under his untucked shirt and not visible, leading Appellant to believe that Taylor was armed. The two spoke for a time lasting two to twenty-five minutes, depending on the testimony. A mutual friend, Shawron Carr, arrived and tried to get Taylor to leave. Appellant testified that when Taylor continued to move forward toward him, he fired three warning shots at the ground. At this point, Appellant could see that Taylor did not have a gun in his hand. Appellant said that Taylor continued to advance, so he shot him. Taylor fell to the ground; Appellant said that he stopped shooting.

Other eyewitnesses gave conflicting versions of the shooting. Appellant's neighbor, Chelsey McClintock, said that she saw him continue to shoot Taylor after he fell to the ground. Carr testified that Appellant shot Taylor when he charged Appellant, that the impact of the shots spun Taylor around, resulting in wounds to his back, and that Appellant did not shoot Taylor after he had fallen to the ground. Tidwell also saw the shooting. Tidwell testified that Taylor was challenging Appellant and stepped forward like he was going to charge him; Appellant then began firing his gun and stopped shooting when Taylor hit the ground.

Taylor was shot four times: in the base of his skull at the junction with the back of the neck, in his lower right back, in his upper right back, and in the back of his upper arm. There were no exit wounds. Police said that he was unarmed.

Officers did not find any damage to the home to indicate that someone had tried to break in. The police found eight shell casings in the front yard and a bullet lodged in a drum set located inside a garage attached to a home across the street. The Fort Worth Police Department firearms and tool mark examiner testified that the shell casings and the bullet found across the street were all fired from the same gun, the nine-millimeter Ruger handgun found inside Appellant's home under the love seat. She also testified that the cartridge casings in a functioning nine-millimeter Ruger handgun shot in the normal position would eject to the right behind the shooter. One shell casing was found seventeen feet from the front door; the rest were even further away from the house. Taylor's bloody shirt was found forty-eight feet from the home.

**Evidence of the Complainant's Past Conduct**

In his first point, Appellant contends that the trial court abused its discretion by excluding evidence regarding Taylor's prior acts because that evidence was admissible to show Appellant's reasonable apprehension and fear of Taylor and that Taylor was the first aggressor.

Appellant has not preserved for appeal his argument that he offered the evidence to show that Taylor was the first aggressor. To preserve a complaint for our review, a party must have presented to the trial court a timely request,

4

objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.[2] Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule.[3] Below, Appellant repeatedly indicated to the trial court that he wanted to use the evidence to show his state of mind at the time of the offense. He directs us to no place in the record, nor have we found such instance, where he unsuccessfully offered the evidence to show that the complainant was the first aggressor. We overrule this portion of Appellant's first point.

Appellant tried to present evidence of Taylor's past behavior in order to explain his own state of mind at the time of the shooting. As the Texas Court of Criminal Appeals has explained,

> [T]he defendant may offer reputation or opinion testimony or evidence of specific prior acts of violence by the victim to show the "reasonableness of defendant's claim of apprehension of danger" from the victim. This is called "communicated character" because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not. This theory does not invoke Rule 404(a)(2) because Rule 404 bars character evidence only when offered to

---

[2]Tex. R. App. P. 33.1(a)(1); *Landers v. State*, 402 S.W.3d 252, 254 (Tex. Crim. App. 2013); *Sample v. State*, 405 S.W.3d 295, 300 (Tex. App.—Fort Worth 2013, pet. ref'd).

[3]Tex. R. App. P. 33.1(a)(2); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011).

5

prove conduct in conformity, *i.e.*, that the victim acted in conformity with his violent character. Here, the defendant is not trying to prove that the victim actually is violent; rather, he is proving his own self-defensive state of mind and the reasonableness of that state of mind.[4]

But rule 403 of the rules of evidence states that otherwise relevant evidence nevertheless may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.[5] Thus, in conducting a rule 403 analysis, a court must balance the probative force of the evidence and the proponent's need for it against any tendency it may have to lead the jury to resolve an issue on an incorrect ground "or [to] distract the jury from the main issues."[6] The court must also evaluate how long the proponent would need to develop the evidence, whether the evidence is repetitive of evidence already admitted, and whether the jury is in a position to fairly consider the evidence.[7]

---

[4]*Ex parte Miller*, 330 S.W.3d 610, 618–19 (Tex. Crim. App. 2009) (citations omitted).

[5]Tex. R. Evid. 403.

[6]*Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006).

[7]*Id.* at 641–42.

We review a trial court's decision to exclude evidence under an abuse of discretion standard.[8]  A trial court does not abuse its discretion as long as the decision to exclude the evidence is within the zone of reasonable disagreement.[9]

Appellant asked to testify about seven specific acts of Taylor's.  One of them was an arrest for the possession of drug paraphernalia.  Appellant abandoned his proffer of the drug paraphernalia evidence; we therefore hold that he forfeited that part of his point on appeal.[10]  We consequently confine our analysis to the remaining six acts.

Appellant wanted to introduce evidence that Taylor told him that "a dude was at his car, and he came out and assaulted the dude.  He got charged for assaulting—beating a dude up—beating him down bad."  "He said the guy was at his car, trying to break into his car, and he caught him."  "[I]t was aggravated assault, but it wasn't with no weapon or nothing.  It was with his hands."

Appellant also wanted to introduce evidence that he had learned from Taylor "out of his own mouth, telling [Appellant] a couple of other occasion[s], where he got caught for theft or robbing or stealing and a couple of cases where he was caught with theft or robbery or whatever."  "He didn't say nothing about

---

[8]*Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

[9]*Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

[10]*See Bland v. State*, 417 S.W.3d 465, 472–73 (Tex. Crim. App. 2013).

no aggravated robbery or theft. He just let [Appellant] know he had gotten [in]to some trouble for that."

Appellant also testified on voir dire that he saw Taylor "with an AK-47, a—a little-bitty one." Appellant said that he and a friend had stopped by the house "where [Taylor] was staying at the time over on the east side of Fort Worth." Taylor "came out of the bedroom and showed [Appellant and the others] this weapon." "It was like—more like—like showing off like, look what I have. He was showing everybody in the house."

Appellant also offered,

I have personal knowledge of two other incidents that I was around. One incident took place at my house probably, I want to say, two months prior to all this happening.

. . . .

He came over to my house one day, stopped by. We—it was just me and my—one other friend over there. And at the time I'm not knowing him, and the other friend done had words or had a problem or something. And so when I—when I . . . let him in, we sitting there talking, playing a game like usually, him and another guy had some little words, and I had to stop it because we was in my house.

And I told him, I say, No, this ain't the place for that, man. Y'all do that on y'all own time.

And he—he had came in. He was actually trying to get the other dude riled up to fight him. He tried to fight him in my house, and I had to ask him—ask him to leave then. But he left, you know, and I told the other dude, don't—don't worry about that, man. I met you—I met him through y'all, so what I'm going to look like sitting with two of y'all, y'all supposed to be friends. Why I'm going to sit back and witness y'all fighting and this my house. Y'all have to respect me. If I don't want y'all fighting, you need to respect that.

8

. . . .

And the other incident happened at my one friend's, Shawron Carr cousin, house. M.T. had came by there. I don't know what the specific incident was between M.T. and Shawron's cousin, but M.T. had came through there and had—he had left, and when me and Shawron had came by and while we visiting Shawron's cousin, M.T. had returned, and he had returned in the same aggressive mode saying little—little things, threats toward Shawron's cousin.

. . . .

Shawron had told M.T.—was like, Man, you know you not right, man. You just need to go on, leave, get away from here, and if this how you going to be acting around us, you don't need to come around us no more.

Appellant also testified on voir dire that at clubs, Taylor's "attitude—the way he carry hisself, he—he real like aggressive, you know, jumps in people face, throws gang signs, all that type of stuff." Appellant further stated that he had "pictures with M.T. on there and other witnesses that was there. Everybody has pictures from when we was in the club and stuff with M.T. on there throwing them gang signs and holding money, too." Finally, Appellant offered testimony that at the time of the shooting, he believed that M.T. was from Westside Como and that the Como area gang affiliation was "mainly like the Crips."

Defense counsel told the court:

The purpose of this testimony is [to show] what [Appellant] believed on the date this offense happened, whether he had reason to believe. We're not looking to make—you know, impeach and make this guy look terrible, but we are looking to show what my client's state of mind was on that date as to whether or not he knew Matthew Taylor's potential for being violent.

9

The trial court excluded all the evidence, stating that it was not relevant for a claim of self-defense and that its probative value was substantially outweighed by its prejudicial effect. The trial court also stated,

> [M]any of them are not relevant. In specifics, with regard to the aggravated assault with a serious bodily injury situation, most of this information is not from personal knowledge that he . . . observed . . . the victim engaging in.
>
> It is with regard to some other information, and in addition to it, the possession of a weapon by an individual in their own home is permissible. Now, whether or not the person's known to carry the weapon out and about would be pertinent, but that is not what has been discussed or presented in the . . . proffer.
>
> And so, therefore, that information is highly prejudicial under those . . . particular circumstances. That is not what's been alleged in the events thus far, and based upon the totality of the record, in addition to my knowledge from seeing the . . . three days of trial, those matters shall not be gone into.

None of the evidence took very long to develop, and it was not repetitive or confusing. While Appellant contends that the evidence that he personally observed was particularly relevant and necessary to his defense, none of it would directly contribute to his alleged belief that Taylor was armed when Appellant shot his gun eight times, hitting Taylor four times on the back of his body. The only evidence tying Taylor to a weapon did not portray him as violent, just as a braggart. And while the evidence of Taylor spoiling for a fight in two different homes is similar to the facts of the case before us, Appellant offered no evidence that Taylor had exhibited or used a weapon in those other instances. The evidence Appellant sought to admit was relevant to show Taylor's tendency to

10

provoke fights. The evidence already admitted in the case at bar, however, demonstrated more strongly that Taylor was being combative and aggressive with Appellant on the day in question than the evidence of prior episodes could have.

Nevertheless, the evidence that Taylor was a gangbanger with a rap sheet and a penchant for starting trouble did lend support to Appellant's claim that he believed Taylor was armed and gives rise to the question of whether Appellant believed Taylor's perceived aggression and penchant for violence rose to a level justifying deadly force. After balancing the rule 403 factors, we hold that the trial court abused its discretion by excluding the proffered evidence.

Applying the proper standard of review for harm,[11] however, we note that the jury was allowed to hear evidence of Taylor's conduct during the three encounters with Appellant on the day of the shooting. Given the record before us, there is little question that Appellant was justified in going outside armed in order to get Taylor to leave his property. Based on Appellant's knowledge of Taylor that the jury did not hear, Appellant could legitimately have claimed the fear to which he testified. But the fear was equally legitimate based on the evidence before the jury. Once Taylor turned to leave, however, and once it was clear that he was unarmed, neither the excluded evidence nor the evidence before the jury nor any combination thereof justified the shooting. We therefore

---

[11]*See* Tex. R. App. P. 44.2(b).

11

hold that any error in excluding the proffered evidence was harmless because it did not affect Appellant's substantial rights.[12] We overrule the remainder of Appellant's first point.

**Charge on Necessity**

In his second point, Appellant contends that the trial court erred by refusing to charge the jury on necessity to justify uncharged conduct. The jury charge provides,

> Upon the law of self defense you are instructed that a person is justified in using force against another when and to the degree he ***reasonably believes the force is immediately necessary*** to protect himself against the other person's use or attempted use of unlawful force.
>
> The use of force against another is not justified in response to verbal provocation alone.
>
> A person is justified in using deadly force against another:
>
> (1)      if he would be justified in using force against the other in the first place, as set out above; and
>
> (2)      ***when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself or a third person against the other person's use or attempted use of unlawful deadly force; or to prevent the other's imminent commission of robbery or aggravated robbery.***

---

[12]*See* Tex. R. App. P. 44.2(b); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).

(3)    By the term "reasonable belief" as herein used is meant a belief that would be held by an ordinary and prudent person in the same circumstances as [Appellant].

(4)    By the term "deadly force" is meant force that is intended or known by the person using it to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.

(**5)**    **The actor's belief that deadly force was immediately necessary as described above is presumed to be reasonable if the actor:**

    a.    Knew or had reason to believe that the person against whom the deadly force was used:

        i.    Unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation;

        . . . .

        iii.    Was committing or attempting to prevent the other's imminent commission of robbery or aggravated robbery;

    b.    The actor did not provoke the person against whom the force was used; and

    c.    **The actor was not otherwise engaged in criminal conduct activity other than a Class C misdemeanor that is a violation of the law or ordinance regulating traffic at the time the force was used.**

"Habitation" means a structure or vehicle that is adapted for the overnight accommodation of persons.

**You are instructed that a person commits an offense if he knowingly discharges a firearm at or in the direction of a habitation or vehicle and is reckless as to whether the habitation or vehicle is occupied. This offense is a third degree felony.**

13

***You are instructed that a person commits an offense if the person recklessly discharges a firearm inside the corporate limits of a municipality having a population of 100,000 or more. This offense is a Class A misdemeanor.***

. . . .

Now, if you find from the evidence beyond a reasonable doubt that on the occasion in question, [Appellant] committed the offense of aggravated assault, but you further find from the evidence, or have a reasonable doubt thereof, that [Appellant] reasonably believed, as viewed from his standpoint at the time, that from the words or conduct, or both, of Matthew Taylor, it reasonably appeared to [Appellant] that his life or person or the li[ves] or person[s] of [his] children were in danger and there was created in [Appellant's] mind a reasonable expectation of fear of death or serious bodily injury from the immediate use of unlawful deadly force at the hands of Matthew Taylor to himself or [his] children, and ***that*** acting under such apprehension and ***reasonably believing that the use of deadly force on his part was immediately necessary to protect himself or [his] children against Matthew Taylor's use or attempted use of unlawful deadly force***, he shot Matthew Taylor with a firearm, then you should acquit [Appellant] on the grounds of self defense, or if you have a reasonable doubt as to whether or not [Appellant] was acting in self defense on said occasion and under the circumstances, then you should give [Appellant] the benefit of that doubt and say by your verdict Not Guilty.

However, if you find from the evidence beyond a reasonable doubt:

(1)     that at the time and place in question [Appellant] did not reasonably believe that he or [his] children [were] in danger of death or serious bodily injury; OR

(2)     that [Appellant], under the circumstances, and viewed from his standpoint at the time, ***did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself or [his] children against Matthew Taylor's use or attempted use of unlawful deadly force, then you will find against [Appellant] on the issue of self defense.***

14

You are instructed that if there is any testimony before you in this case regarding [Appellant's] having committed bad acts other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that [Appellant] committed such other bad acts, if any, . . . and even then you may only consider the same in determining the intent of [Appellant] if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose. [Emphasis added.]

Even though the trial court charged the jury on self-defense and defense of third persons, Appellant argues that the trial court erred by refusing a charge on necessity because of the additional jury charge instructions on the uncharged offenses of discharging a firearm in the city limits and recklessly discharging a firearm at a habitation. Appellant contends that these "two charges effectively removed [him] from the protection of the Castle Doctrine." He therefore requested a charge on necessity to combat them. He did not request and is not arguing that he was entitled to a necessity charge for the charged offense of aggravated assault.

We note that the jury was not charged on the presence or absence of a duty to retreat; "retreat" is not mentioned in the jury charge. We therefore construe Appellant's argument as a complaint that the presence of the two instructions on uncharged conduct could have caused the jury to find that he was engaging in otherwise unlawful conduct when he shot Taylor and that he therefore needed the necessity defense charge to legitimate that conduct and

15

trigger the presumption that his belief that deadly force was imminently necessary was reasonable.[13]

In light of the evidence that a projectile was found in the garage of another house, and the fact that the shooting occurred within the Fort Worth city limits, the additional instructions appear to eviscerate any hope of a successful self-defense claim. At best, the conflicting instructions are confusing. But on appeal, Appellant does not contend that the trial court erred by giving these additional instructions, although he objected to the instructions below. Instead, he complains solely of the denial of a necessity instruction regarding the uncharged conduct.

A step-by-step analysis is necessary. Necessity, self-defense, and defense of a third person are all justification defenses.[14] Self-defense and defense of a third person are justification defenses that exclude criminal responsibility for using deadly force.[15] It was established at least as early as 1854 that the right of self-defense is based upon and limited by necessity; when the necessity arises, the right instantly accrues, and when the necessity, real or

---

[13]*See* Tex. Penal Code Ann. § 9.32(b) (West 2011).

[14]*See id.* §§ 9.22, 9.31, 9.32.

[15]*See id.* §§ 9.31, 9.32.

16

apparent, ceases, the right no longer exists.[16]  All acts in furtherance of the justified killing or assault are likewise justified.[17]  That portion of section 9.32 providing that "[t]he actor's belief under Subsection (a)(2) that the deadly force was immediately necessary . . . is presumed to be reasonable if the actor: . . . was not otherwise engaged in criminal activity"[18] refers only to criminal activity that is not an essential part of the justified murder or assault.[19]  Displaying the weapon, attempting to commit the murder or assault, or firing the weapon intentionally or recklessly in the course of the assault, the murder, or the attempted assault or murder are all included within the justification defense.[20]  It is error for the trial court to separate out components of the greater assaultive offense and instruct the jury that those components are criminal acts that deprive the defendant of the presumption that his belief that the force was immediately necessary is reasonable.[21]

---

[16] See Lander v. State, 12 Tex. 462 (1854); see also Brendendick v. State, 34 S.W. 115, 115 (Tex. Crim. App. 1896).

[17] See Villa v. State, 370 S.W.3d 787, 792–93 (Tex. App.—Eastland 2012), aff'd, 417 S.W.3d 455 (Tex. Crim. App. 2013).

[18] Tex. Penal Code Ann. § 9.32(b)(3).

[19] See Morales v. State, 357 S.W.3d 1, 7–8 (Tex. Crim. App. 2011).

[20] See Alonzo v. State, 353 S.W.3d 778, 781–82 (Tex. Crim. App. 2011); Burd v. State, 404 S.W.3d 64, 74–75 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

[21] See Alonzo, 353 S.W.3d at 781–83.

To summarize, self-defense and defense of a third person are necessity defenses that justify all aspects of the assaultive conduct justified by the defense. A defendant is not entitled to a separate necessity defense regarding independent components of the assaultive conduct justified by self-defense and defense of a third person. The trial court errs in instructing the jury that components of the justified assaultive conduct are criminal acts that deprive the defendant of the presumption of reasonableness. But Appellant did not complain here about the instructions on uncharged conduct, and the trial court did not err in refusing Appellant's requested necessity instruction because the jury charge already included instructions on self-defense and defense of a third person, justification defenses steeped in necessity, and those justification defenses already applied to all components of the charged conduct, including firing a weapon in a municipality and recklessly firing a gun at a habitation. We therefore overrule Appellant's second point.

**Conclusion**

Having overruled Appellant's two points, we affirm the trial court's judgment.

18

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  May 8, 2014