[No. 1802.]

AB. ALLEN v. THE STATE.

1. MURDER — SELF-DEFENSE — THREATS — CONTINUANCE.— The element of self-defense, based upon the threats of the deceased, does not enter into a murder case in the absence of proof showing that at the time of the killing, the deceased, by some act then done, manifested an intention to execute the threats. Instead of tending to show such fact in this case, the evidence shows an entire absence of any such act or demonstration on the part of the deceased at the time of the homicide. Under such circumstances, proof of threats was immaterial, and, independent of the question of diligence, the court properly refused to grant a continuance in order to procure witnesses to prove such threats.

2. SAME — EVIDENCE.— Exculpatory statements made by the slayer, not *res gestæ*, though made at the time he surrendered, were self-serving declarations, and as such were inadmissible; and for that reason it was not error to refuse a continuance in order to procure the attendance of a witness to prove the same.

3. NEW TRIAL — MISCONDUCT OF THE JURY.— The procuring and imbibing of ardent spirits even in moderation, while deliberating upon their verdict, is misconduct of a jury, or of the members thereof so offending, at once reprehensible and inexcusable, but, in the absence of proof of the use of such quantities of intoxicating liquor as to probably influence their verdict to the prejudice of the accused, such misconduct does not constitute reversible error.

APPEAL from the District Court of Marion. Tried below before the Hon. W. P. McLean.

The indictment in this case charged the appellant with the murder of Robert A. Pastian, in Marion county, Texas, on the 15th day of April, 1884. His trial resulted in his conviction of murder in the second degree, and his punishment was assessed at a term of sixty years in the penitentiary.

The State introduced W. J. Ellington as her first witness. He testified that he was a resident of Marion county, Texas. He was acquainted with and recognized the defendant at the bar as Ab. Allen, the party charged in the indictment in this case. He was acquainted with the deceased, Robert A. Pastian, in his life-time. The witness was with the deceased at the time of his death. The defendant, the deceased and the witness went to the city of Jefferson together in the wagon of the witness, on the day that the deceased was killed. They arrived in the city about 9:30 o'clock in the forenoon. Henry Smith and A. D. Vice were also in Jefferson on that day. The defendant and the deceased drank together a great deal during the day, and both became drunk by evening. In

the course of the evening the witness and the deceased started home together in the witness's wagon, leaving the defendant in town. When the witness and the deceased had accomplished about a mile on their return way home, they were overtaken by Henry Smith's two-horse wagon, containing Smith, A. D. Vice and the defendant. The defendant got out of Smith's wagon and got into the wagon with the witness and the deceased. When about one mile beyond the bridge on the Linden and Jefferson road, and about three miles distant from Jefferson, the defendant got out of the witness's wagon, and got in Smith's wagon. Witness's wagon had been traveling in front of Smith's. The back gate to the witness's wagon became somewhat deranged, and the witness (having then both the deceased and the defendant with him) stopped to arrange it. While thus engaged, Smith's wagon drove up and stopped, and the deceased got into a discussion about the relative merits of a mule of his and Smith's pony. The defendant said he would give $100 for Smith's pony, and that was $20 more than he would give for the deceased's mule. This discussion between the defendant and deceased finally degenerated into a dispute, when the witness told them to " dry up; " that he, witness, could take his old horse and beat either the mule or the pony in a race. The defendant then said that he would bet $100 in gold that he could take Smith's pony and beat the witness's old horse, and demanded of the witness whether or not he was willing to make the race. The witness replied that he had not yet seen the defendant's money, and the defendant replied by asking the witness where his money was. The witness replied: "I will bet my old horse himself." The defendant then sprang out of the witness's wagon and began to ungear Smith's pony, and witness, with the deceased still in his wagon, drove off and left the defendant at Smith's wagon.

When the witness had driven one hundred and fifty or perhaps two hundred yards, the deceased missed one of the two bottles of whisky with which he had started from town. On missing it he declared that the defendant had stolen it, and stopped the wagon and got out, and went back to meet Smith's wagon to demand his whisky from the defendant. When he met Smith's wagon he accused the defendant of having taken the liquor, and demanded its return. The defendant denied that he had taken it. While the discussion between them about this matter was going on, the witness examined the deceased's saddle-bags and found the missing article. Thereupon he hallooed to the deceased and said: " Bob, here is your whisky." The deceased then said to the defendant:

" All right!  You have not got it, Ab., and I am sorry I accused you of having it."  The defendant replied:  " That's all right, Bob," and expressed himself as being satisfied.  The deceased then produced a bottle of whisky, and he and the defendant took a drink. The two wagons then drove on, and nothing passed between the defendant and the deceased until Alford's store was reached.  At Alford's store both wagons stopping, the deceased purchased cigars and treated the crowd.  After the treating was over, the defendant said to the deceased:  " Bob, the next time you accuse me of stealing a bottle of whisky, I will take one."  The deceased replied:  "I am satisfied about the whisky, Ab., and know that you did not get it." Defendant closed this colloquy by saying:  "I am, too."  Both wagons then left the store and drove on to Berry's place, where the deceased was killed.

At Berry's place the deceased turned to Smith's wagon, and said to Smith:  " Smith, you cursed me."  The defendant and Vice were then in Smith's wagon.  Smith denied that he had cursed the deceased.  The deceased then replied:  "Smith, you called me a son of a b—h."  This imputation also was denied by Smith.  Witness remarked to the deceased:  " You are wrong; you are drunk; Smith did not curse you."  Witness then stopped his wagon, and Smith drove his up to the side, his horses being about even with the front wheels of witness's wagon, and the wagons stood in that position. The deceased then repeated his charge that Smith had cursed him, which charge Smith again denied.  Mr. Vice then remarked to the deceased:  "No, my friend, you are wrong; Mr. Smith does not curse."  The deceased replied to Vice that if he said Smith did not curse him, then he, Vice, " told a d—d lie."  Smith then said to deceased:  " Come around and take a drink."  Deceased replied that he would not permit any man to curse him, and then cursed Smith. Smith made a motion as though he was going to get off his seat, remarking that he did not feel called upon to submit to such abuse. Witness shook his head at Smith in suggestion not to pay any attention to the deceased in his then condition.  Smith smiled as he comprehended the suggestion, and again invited the deceased to come around and take a drink.  About that time the deceased got out of witness's wagon on the left side, and the defendant got out of Smith's wagon on the same side.  Deceased was about even with the front wheels of witness's wagon.  Defendant was on the left of Smith's wagon with Smith's horses between him and the deceased. Deceased said:  " That is all right, Smith; if you want anything out of me you can get it; or you either, Allen."  Deceased then started

around the horses one way, and the defendant started around the other way, meeting the deceased. As the two met in front of the horses, facing each other, the defendant said: "Bob, if you want anything out of me, here is at you," and fired his pistol. The ball struck the deceased in the left eye, and he fell, and expired in a few minutes. The defendant then walked back to the wagon, putting his pistol back in his pocket. Smith said: "Allen, you have killed him." The defendant replied: "Yes, you all see it. I will kill any d—d man who comes at me with his hands in his pockets."

The defendant and the deceased got out of the wagons about the same time. As Allen got out of Smith's wagon, he drew on his coat and pulled out his pistol, and, with it drawn, advanced around the horses. He may have started around the horses before he drew his pistol, but he had the weapon out as he advanced around to meet the deceased. As soon as the two men got face to face, in front of the horses, defendant made the remark quoted and fired point blank at the deceased. The deceased had nothing in his hands at the time. His hands were not in his pockets, but were hanging down by his side as he advanced around the horses, and were in the same position when he was shot. After firing the fatal shot, the defendant said to the party: "Take my goods that are in the wagons to my wife. I am going back to Jefferson." This all occurred in Marion county, Texas, on the 16th day of April, 1884.

This witness further testified that, about the close of the year 1882, he saw the defendant draw a pistol on the deceased. At that time the deceased was a renter on the defendant's place. The defendant, accompanied by a negro man, went to the house occupied by the deceased on the night in question, and the defendant called for a light. Deceased got a light and went outside and joined the defendant and the negro. Defendant asked the deceased if he was not going to move off the place. Deceased replied that he was. Defendant then said that he was going to nail up his, deceased's, corn crib. To this the deceased objected, and defendant told the negro to nail up the crib door, which order the negro began to obey. Deceased then said: "I will see if I can't move you," and went into his house and returned with his gun, by which time the defendant and the negro were gone. Witness at the time of the homicide had known the defendant about two and a half years, and the deceased about four years. The defendant and the deceased were friendly on the day of the killing.

The State next introduced W. B. Sinns, who testified that at the time of the homicide he was justice of the peace of precinct num-

ber three of Marion county, Texas, and as such officer, acting in his
ex officio character as coroner, he held an inquest over the body of
the deceased. He found that the deceased came to his death from
a gunshot wound in the head, which entered near the right eye.

The State at this point closed, and, the defendant refusing to in-
troduce evidence, the case was given to the jury after argument of
counsel and charge of the court. Being convicted of murder in the
second degree, the defendant filed his motion for new trial, based
partially upon the misconduct of the jury. The evidence intro-
duced by the defendant in support of his motion for new trial is
summarized below.

E. H. Dobbins testified that he was one of the jurors who tried
this case at a prior day of the trial term. The jury at one time
(the record does not disclose at what stage of the trial) was per-
mitted by the court to retire in charge of the sheriff or one of his
deputies. On reaching Austin street in front of the court-house,
the jury turned to the right down the said street, into an alley run-
ning between the said Austin street and Dallas street, immediately
east of the court-house building. The officer took the jury down
this alley, and when they had gone perhaps twenty feet it was dis-
covered that only ten jurors were along, and some one exclaimed:
"We have lost two jurymen." Witness could not remember the
names of the two missing ones. Returning in search of the truants,
they were found in a vacant house immediately under the court-
house, and back behind a partition in the said house. The depth of
the court-house building between Austin and Dallas streets was
about one hundred and fifty feet.

On two occasions pending the trial of this case the jury got and
drank whisky in the jury room at the Grigsby house. Whisky was
drunk in the jury room by some of the jury on the evening of the
verdict. About half-past 5 o'clock on that evening, after court
had adjourned its evening session, and the jury had been taken to
their room in the Grigsby house, the jurors made up a pot with
which to buy a bottle of whisky. Witness contributed to this pot,
as did others whom the witness could not name. This money was
placed on a table which stood in the middle of the room. After a
time this money was found to be gone, and two pint bottles of
whisky stood on the table instead. Witness did not know who got
the money or who placed the whisky on the table. Witness took
one drink of the whisky, and the rest of it was absorbed by those
of the jury who partook of it. About half-past 9 o'clock on that
evening the case was given to the jury on the charge of the court,

and the jury returned to their room to consider of their verdict. They deliberated about an hour or an hour and a half before they reached an agreement. Primarily the jury stood eight for conviction in the first degree, and capital punishment, and four for murder in the second degree with a term of years ranging from five to twenty. The foreman of the jury, W. S. Haywood, was one of the first eight. After the jurors had expressed their views in the discussion of the case, Haywood, whether in jest or not the witness could not say, remarked that it would not do to confine this man in the penitentiary for a term of years, for, when he had served his time out, he would return and kill him, Haywood. For the purpose of bringing the conviction below the highest grade, the jury compromised on a term in the penitentiary of sixty years.

This witness further testified that when the juror William Davis was tested as to his qualifications as a juror, and was placed upon the jury, he had to the witness every appearance of being drunk. Witness could not say that Davis was drunk when the case was being discussed in the jury room. He took another drink that night at supper.

Henry Dodling testified that about supper time on the evening that the verdict in this case was rendered he took two pint flasks of whisky into the jury room in the Grigsby house and placed them on the table where he found the money to pay for them. He did not know who placed the money there. One of the deputy sheriffs — which one he did not know — was present.

The juror Henry Miller testified substantially as did the juror Dobbins concerning every matter of which Dobbins testified. In addition he stated that when the two jurors became separated from the rest of the jury, the distance between the two and the ten was at least seventy-five feet, the way either party would have to go to join the other, or by an air line, a brick house wall intervening, fifteen feet. The period of separation was about one and a half minutes.

William Green, another juror, corroborated the jurors Dobbins and Miller as to the facts to which they testified. In addition he stated that he had known the juror Davis for a great many years. Davis was a drinking man, and when drunk had but little sense. He knew that Davis was drunk when he was placed upon the jury. While the testimony for the State was being introduced, Davis sat with his head hanging, as if in a stupor. Witness did not know that Davis was drunk when the verdict was agreed upon, but it was his opinion, based upon long acquaintance, that Davis had not then

entirely sobered. Other jurors for the defense corroborated the jurors Dobbins and Miller.

The State introduced, in rebuttal, the foreman of the jury, W. S. Haywood. He corroborated the preceding witnesses as to the procurement of the whisky and the separation of the jury, but said nothing about the condition of the juror Davis. Witness was one of the original eight jurors who on the first test insisted upon a verdict of murder in the first degree. Four others, led principally by the juror George W. Wood, insisted upon a verdict of murder in the second degree, with from ten to twenty years in the penitentiary as punishment. Witness laughingly and in jest remarked that it was useless to send this man to the penitentiary to serve out his term and return and kill some member or members of the jury. A compromise was finally agreed upon, the eight receding from murder in the first degree, and the four accepting sixty years in the penitentiary.

In certifying the statement of facts the trial judge explains that the juror Davis was subjected to a rigid and critical examination as to his qualifications by the State's attorney with an evident purpose, if possible, of forcing him to disqualify himself; in which the State's attorney failed. When turned over to the defendant's counsel for further examination, he was promptly accepted without question or objection.

The overruled application for a continuance, which is the subject-matter of the first two head-notes of this report, alleges that by the absent witness Knight the defense expected, if awarded a continuance in order to procure his testimony, to prove that, on the morning of the day on which the killing occurred, and when the defendant and the deceased were on the eve of starting to the city of Jefferson, the deceased told the said witness Knight that he, the deceased, intended to kill the defendant; and that he, deceased, said in substance that either he or the defendant had to die on that day, and that the deceased then and there borrowed a knife of the witness, remarking at the time that said knife would do until he could get to Jefferson and procure a new one. The defense further expected to prove by this witness that after the fatal shot was fired, the witness found a new knife lying on the ground near the body of the deceased, one blade of which was closed, and another blade shot away, as indicated by traces of the pistol ball on the handle.

The application further set out that, by the absent witness, Mrs. Davis, the defendant expected to prove that, on the morning of the day on which the killing occurred, the deceased stopped at the

house of the witness and asked her if the defendant had passed her house on that morning, and that the witness answering in the negative, the deceased proceeded to say that he would kill the defendant on that day; that both of them could not live, and one or the other of them would be brought home dead, that night; that, when Mrs. Davis communicated this fact to the defendant on that morning, the defendant remarked: "Surely Bob would not murder me."

The application further averred that by Wright, the other absent witness, he proposed to prove that, when he surrendered himself to the proper officer of the law, immediately after the said killing, he, defendant, stated that when he fired the fatal shot, the deceased had an open knife in his hand and was rushing upon the defendant with it, cursing the defendant, and swearing that he was then ready and would kill the defendant.

The application further avers that the threats to kill the defendant, as made by the deceased to the witness Knight, were communicated by the said Knight to the defendant on the morning of and prior to the killing.

No brief for the appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. Without determining whether or not the diligence used by defendant to obtain the testimony of the absent witnesses Wright, Knight and Davis was sufficient, we are of the opinion that the court did not err in overruling the application for continuance, in view of the evidence developed on the trial. There was no self-defense in the case.

Evidence of threats made by the deceased against the defendant could afford no justification for the homicide, in the absence of any evidence showing that at the time of the homicide the deceased, by some act then done, manifested an intention to execute the threats. There was no such evidence adduced on the trial, but on the contrary it was proved that the deceased was not making any demonstration whatever against the defendant indicating an assault upon him, but that the defendant deliberately advanced upon him, armed with a drawn pistol, and shot and killed him. Under this state of case, evidence of threats would avail nothing, and was immaterial. (Penal Code, art. 608; *Horbach* v. *The State*, 43 Texas, 242; *Irving* v. *The State*, Id., 236; *Johnson* v. *The State*, 27 Texas, 758; *Lander* v. *The State*, 12 Texas, 462; *Carter* v. *The State*, 8 Texas Ct. App., 372.)

What the defendant told the witness Wright about the homicide, at the time he surrendered himself, was a self-serving declaration; not a part of the *res gestæ*, and would not have been admissible. As to the witness Armistead, no diligence to obtain his testimony was shown, and furthermore, his testimony was immaterial, considered with reference to the evidence on the trial.

It was not error to overrule the motion for new trial upon the grounds of the separation and misconduct of the jury. It was not made to appear that probable injustice to the defendant was occasioned thereby. It was very reprehensible for the jury to send for and obtain whisky, and drink the same during their deliberations upon the case, and such conduct should always be visited with punishment to those guilty of it. But no such immoderate use of intoxicating liquor is shown to have existed in this case as would, in the absence of circumstances tending to show that it had influenced the verdict of the jury, warrant the setting aside of the verdict. (*Davis* v. *The State*, 3 Texas Ct. App., 91; *Cox* v. *The State*, 7 Id., 1; *West* v. *The State*, Id., 150; *Jack* v. *The State*, 26 Texas, 1; *Webb* v. *The State*, 5 Texas Ct. App., 596; *Tuttle* v. *The State*, 6 Id., 556; *Ogle* v. *The State*, 16 Id., 361.)

We have given attention to all the questions presented in the record, and discover no error demanding or justifying a reversal of the conviction, and the judgment is affirmed.

*Affirmed.*

[Opinion delivered March 18, 1885.]